Lusin OZBIRMAN, Plaintiff,

v.

REGIONAL MANPOWER ADMINIS-
TRATOR, UNITED STATES DEPART-
MENT OF LABOR, Defendant.

Francis Raymond WEBSON, Plaintiff,

v.

REGIONAL MANPOWER ADMINIS-
TRATOR, UNITED STATES DEPART-
MENT OF LABOR, Defendant.

Nos. 70 Civ. 3725, 70 Civ. 3724.

United States District Court,
S. D. New York.

Dec. 17, 1971.

Franklin S. Abrams, Abrams & Abrams, New York City, for plaintiffs Webson and Ozbirman.

Whitney N. Seymour, Jr., U. S. Atty., S.D. New York (Joseph P. Marro and Stanley H. Wallenstein, Asst. U. S. Attys., of counsel), for defendant Dept. of Labor.

## OPINION

TYLER, District Judge.

In these cases, plaintiffs Webson and Ozbirman, both of whom are aliens, submitted applications for alien employment certification pursuant to Section 212(a) (14) of the Immigration and Naturalization Act ("the Act"), 8 U.S.C. § 1182(a)

(14).[1] The applications were denied by the Secretary of Labor, and subsequent administrative remedies were unsuccessfully exhausted by plaintiffs. Plaintiffs thereupon commenced these declaratory judgment actions and have now moved for summary judgment, seeking reversal of the Secretary of Labor's determinations.

Since the facts differ in these two cases and because the applications were denied pursuant to different provisions of the Act, the two cases must be discussed separately.

I

Francis Webson, a native and citizen of Bermuda, was admitted to the United States on January 11, 1969 as a non-immigrant visitor for pleasure. On February 24, 1969, Webson submitted an application for change of status to that of non-immigrant student in order to attend a trade school as an auto mechanic. This request was approved by the Immigration and Naturalization Service ("INS") on January 9, 1970, and Webson was permitted to remain in the United States until January 8, 1971, at which time his course of instruction was to have been completed. He completed the auto mechanic's course on October 17, 1969 and six months later submitted an application for alien employment certification pursuant to Section 212(a) (14) of the Act. Webson sought certification as an automobile mechanic with Yankee Service Corporation, Bronx, New York. Pursuant to the current wage information derived from the Bureau of Labor Statistics Wage Survey for the Metropolitan New York area, the New York State Department of Labor determined that the wage offer of $3.25 per hour did not meet the "prevailing wage" of $4.05 per hour of an automobile mechanic. This action was taken in accordance with the regulations promulgated under Section 212(a) (14) of the Act, 29 CFR 60.6(a), directing the manner in which the prevailing wage should be determined. The New York State Department of Labor also determined that auto mechanics constituted a shortage occupation, i. e., there were not "sufficient workers in the United States who are able, willing, qualified, and available" to perform the job. See 8 U.S.C. § 1182(a) (14) (A). By letter dated April 30, 1970, counsel for Webson again requested certification, stating that the wage offered by the employer meets the union wage negotiated by Yankee Service Corporation with Local 3036, New York City Taxi Drivers Union, for automobile mechanics in the taxi industry. This request for labor certification was denied by the United States Department of Labor, Manpower Administration, solely because the wage offer was below the "prevailing wage" for the occupation in the intended area of employment, i. e., there would be an adverse effect on wages of workers in the United States. See 8 U.S.C. § 1182(a) (14) (B). Thereafter, as noted above, plaintiff unsuccessfully exhausted his administrative remedies. Webson is presently residing in the United States illegally, as his non-immigrant visa was valid only until January 8, 1971.

This court, of course, must answer two threshold questions before proceeding to

---

1. Section 212(a) (14), 8 U.S.C. § 1182(a) (14), provides in part:

"(a) Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

(14) Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed . . . ."

the merits of this controversy: (1) whether the determination of the Secretary of Labor with respect to plaintiff's application is subject to judicial review, and (2) if so, the scope of review.

Under Section 212(a) (14) of the Act, no alien seeking to enter the United States for the purpose of performing skilled or unskilled labor can be issued a visa permitting entry into the United States unless the Secretary of Labor has determined that: (1) there are not sufficient workers in the United States to fill the position, and (2) the employment of aliens will not adversely affect wages and working conditions of workers in the United States similarly employed.

■ The following comment appeared in the reports of both the Senate and House Committees while the amended Act was being considered by Congress:

"The Department of Labor should have no difficulty in adapting to this new procedure [labor certification] inasmuch as the Department [of Labor] through its Bureau of Employment Services agencies, presently determines availability of domestic workers and the standard of working conditions. There is no apparent need to increase facilities." House Report No. 745 (89th Cong., 1st Session) at page 14; Senate Report No. 748 (89th Cong., 1st Session) U.S.Code Cong. and Admin.News, 1965, at page 3334.

The above comment and the labor certification procedure itself indicate that each determination must be based upon facts and figures which are within the expertise of the Department of Labor. Each determination requires knowledge of the pertinent job and region, applica-

ble pay scales, and application of these facts to each alien applicant. Because of these variables in the labor certification procedure, it follows that the ultimate decision as to whether there is an "adverse effect" or "sufficient workers" is committed to the discretion of the Secretary of Labor. See Cobb v. Murrell, 386 F.2d 947 (5th Cir., 1967).

■ The Administrative Procedure Act, 5 U.S.C. §§ 701–706 provides in part:

"Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—

(a) Right of Review—Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute shall be entitled to judicial review thereof.

(b) Form and Venue of Action—The form of proceeding for judicial review shall be any special statutory proceeding relevant to the subject matter in any court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action (including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus) in any court of competent jurisdiction . . ."[2]

The above statutory mandate substantially excludes jurisdiction when, as in this case, agency action is by law committed to agency discretion. Yet, such discretion does not immunize administrative action from judicial review, when, for example, there has been an abuse of discretion, Wong Wing Hang v.

---

2. The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes a federal court to render a declaratory judgment in a "case of actual controversy within its jurisdiction." As this is an actual controversy between the alien and immigration officials over the merits of the Department of Labor's certification, this court has jurisdiction insofar as it is not excluded by the Administrative Procedure Act.

It should also be noted that the challenges in this case are directed toward an adverse labor certification and not a final exclusion or deportation order. Therefore, since the challenges are collateral to a final exclusion or deportation order, review under the Administrative Procedure Act is proper. Cf. Mendez v. Major, 340 F.2d 128 (8th Cir., 1965).

Immigration and Naturalization Service, 360 F.2d 715 (2d Cir., 1966); if an arbitrary classification has been set up excluding a particular class of aliens from discretion, Mastrapasqua v. Shaughnessy, 180 F.2d 999 (2d Cir., 1950); or if discretionary action was taken pursuant to regulations which do not implement the statutory purpose or wording resulting in an error of law. See Barber v. Gonzales, 347 U.S. 637, 74 S.Ct. 822, 98 L.Ed. 1009 (1954).

 Webson has attacked the regulations promulgated under Section 212(a) (14) (B) of the Act. See 29 CFR 60.-6(a)–(k). He argues that the "prevailing wage" concept of the regulations do not correctly implement the statutory purpose; alternatively, he submits that the Secretary of Labor's determination that the wages offered him would have an adverse effect on wages of workers in the United States was an abuse of discretion. I am at least sufficiently persuaded by Webson's contentions to conclude that this court has power to review the adverse determination of the Secretary of Labor.

 Specifically, Webson urges that, pursuant to the regulations, the Secretary of Labor has relied on the "prevailing wage" concept to the exclusion of other employment factors. Therefore, the argument continues, the regulations misconstrue the meaning of "adverse effect" and also fail to adequately implement the statutory purpose. Aware that an executive agency head's interpretation of a statute should be given great weight, I nonetheless conclude that Webson is correct in asserting that the regulations promulgated under the "adverse effect" clause of the Act do not implement the statutory purpose and misconstrue the meaning of adverse effect.

 The Congressional purpose in enacting Section 1182(a) (14) is set out in House Report No. 1365, 82 Cong.

1952, U.S.Code Cong. and Admin.News, 1952, pp. 1653, 1705:

"Safeguards for American labor

While the bill [labor certification Act] will remove the 'contract labor clauses' from the law, it provides strong safeguards for American labor . . . It is the opinion of the committee that this provision will adequately provide for the protection of American labor against an influx of aliens entering the United States for the purpose of performing skilled or unskilled labor when the economy of individual localities is not capable of absorbing them at the time they desire to enter the country."

It is clear that the primary purpose of the labor certification procedure is to protect the American labor market and to prevent depression of wages and working conditions. Also at least implicit in the Act is the related purpose of eliminating cheap labor or "contract labor" from the American labor market. Senator Kennedy, the principal sponsor of the amended bill in the Senate, stated during hearings that "the function of the Secretary [of Labor] is to increase the quality of immigration, not to diminish it below levels authorized by law." 111 Cong.Rec. 24227. As stated earlier, one of the prerequisites to certification under the Act is the absence of an adverse effect on wages. In order to comply with this statutory mandate, the Secretary of Labor has promulgated regulations which, among other factors, includes a "prevailing wage" concept for occupations in specified geographic regions. See 29 CFR 60.6(a). The prevailing wage is based upon the average wage in a geographic region for the pertinent occupation.[3] Other items listed in the regulations for determining adverse effect are factors such as working conditions and fringe benefits. See 29 CFR 60.6(a)–(k). As I read the regula-

---

3. Plaintiff Webson has also challenged the use of the average wage concept embodied in the regulations as opposed to the use of a base wage. Because of the view I take with regard to other issues raised by Webson there is no need to decide this issue at the present time.

tions, all of the enumerated factors must meet a prescribed standard before an alien receives labor certification. One result, then, is that all employment benefits are not considered as a package in determining adverse effect since a salary offer below the prevailing wage will prevent labor certification.[4] In denying labor certification in the present case solely because the salary offer did not meet the prevailing wage, the Secretary of Labor has effectively failed to recognize or consider that all forms of compensation do not take the form of money. The appraoch of the regulations and of the Secretary of Labor in this case equates a wage below the prevailing rate with an adverse effect on wages. But the interrelationship between one's pay rate and other fringe benefits indicates that such an adverse effect would not necessarily occur. The term "adverse effect" is necessarily a box of variables. Shorter hours, unique vacation periods or working conditions, proximity to home and family, and exceptional fringe benefits are all factors which influence the labor market and have an effect on wages in this country. The above list doubtless could be expanded, but the point should be clear that an employee can receive exceptional benefits which are not in the form of money and which prevent any adverse effect notwithstanding a deficiency in wages. Any determination of an adverse effect on wages should be scrutinized and balanced in light of the variables which enter into a job offer.[5] In this way, the purpose of Congress in protecting the American labor market could be implemented in light of realistic employment factors.

The dual purpose of eliminating alien cheap labor could be accomplished without imposing hardship on those aliens who are receiving pay below the "prevailing wage", but yet are not receiving substandard salaries which adversely affect wages of United States workers. Congress, in my view, did not intend that such aliens should be denied labor certification. Webson was offered a wage of $3.25 per hour which was below the prevailing wage of $4.05 per hour. The offered wage met the union wage negotiated for automobile mechanics in the taxi industry.[6] The inflexible regulations precluded the Secretary of Labor from considering this variable in determining whether there was an adverse effect on wages.

Since the promulgated regulations improperly construe the term "adverse effect" and because the regulations do not properly and realistically implement the statutory purpose, I remand this case to the Department of Labor to exercise its discretion in light of the principles set forth in this opinion.

 Alternatively, I rule that it was an abuse of discretion for the Secretary of Labor to deny plaintiff's application in the circumstances of this case. The wage offered Webson was union negotiated and equivalent to his co-workers' salary. A primary factor in achieving adequate wages for laborers in this country has been the effect of unions. To affirm the decision of the Secretary of Labor would require this court to ignore the fact that labor unions attempt to obtain the most the market will bear for their members through collective bargaining. Yet the Secretary denied Webson's application solely because his wage offer was below the Labor Department's prevailing wage. By failing to consider whether a collectively bargained wage

4. In any event, the record in this case indicates that the sole reason for denying labor certification was a salary offer below the prevailing wage.

5. This is not to say that every possible employment variable must be considered, but the Secretary of Labor should determine which factors play a major role in affecting wage rates and consider such items as a package. Such a procedure should not impose a major burden on the Department of Labor since the prospective employer could easily supply the information along with the wage data which he now supplies.

6. The plaintiff has asserted that Taxi Drivers Union Local 3036 who negotiated this contract is "almost entirely composed of native born American citizens."

offer would have an adverse effect on wages, the Secretary of Labor has abused his discretion.[7] On remand of this case, the Secretary should reconsider his discretion in light of the foregoing.

## II

Lusin Ozbirman, a native and citizen of Turkey, was admitted to the United States on December 8, 1969 as a non-immigrant visitor for pleasure. On February 18, 1970, Ozbirman submitted an application for alien employment certification pursuant to Section 212(a) (14) of the Act. 8 U.S.C. § 1182(a) (14). The plaintiff sought certification as a custom tailor whose prospective employer was Martin Brothers, Building S–651, Governor's Island, New York. The New York State Department of Labor determined that there were domestic workers available for this occupation. This finding was based on information supplied to the New York State Employment Service that qualified applicants for positions as tailors were registered in the Manhattan Apparel Office and actively seeking employment. The Secretary of Labor denied the application because there were sufficient workers in the United States who were available at the "place" where the alien was destined to perform labor. See 8 U.S.C. § 1182(a) (14) (A). Thereafter, the Department of Labor was advised by the State agency that applicants had been referred to this employer, but that he was difficult to please. Subsequently, plaintiff, who is still residing in this country, unsuccessfully exhausted her administrative remedies.

■ Ozbirman alleges that the Secretary of Labor has established a category of tailors "regardless of individual differences concerning the applications." She argues that such a category consti-

tutes an arbitrary classification and abrogates the valid exercise of discretion as required by Section 212(a) (14) of the Act. It is far from clear what plaintiff means by "individual differences" concerning the applications. In any event, I cannot agree with plaintiff that the absence of sub-classes within the tailor category based on, for example, an applicant's background is arbitrary or fails to accomplish and further the purpose of the statute. The Secretary has determined that there are sufficient workers in the United States who are available and qualified for the position sought by plaintiff. Nothing in the wording or legislative history of the statute indicates that the Secretary should depart from a generalized inquiry into whether the above threshold requirement has been met. While it may be true that some aliens will be denied labor certification when their employment background is superior to that of workers in the United States, it is also obvious that further sub-classes within the tailor category would erode the purpose of the statute by denying positions to workers who meet the threshold qualifications.

■ Ozbirman also argues that the Secretary has misread the statute by promulgating regulations which define the "place" of employment as a geographic region rather than the business situs of a specific employer. The legislative history is not clear on this point; however, there are indications that such a specialized inquiry by the Secretary of Labor is not required. As Senator Kennedy noted in explaining the amended labor certification procedure to the Senate on September 17, 1965:

". . . it was not our intention that all intending immigrants must undergo an employment analysis of great detail that could be time con-

---

7. As noted earlier, wages are one of many variables which enter into acceptance of a job offer. Likewise, in collective bargaining, wages are only one of the many items—e. g. fringe benefits—which the union attempts to gain as a package deal.

Again, in abusing his discretion, the Secretary has failed to consider that the union negotiated wage, offset by other items in the package, would not necessarily cause an adverse effect on wages.

suming and disruptive to the normal flow of immigration. We know that the Department of Labor maintains statistics on occupations, skills and labor in short supply in this country. Naturally, then, any applicant for admission who falls within the categories should not have to wait for a detailed study by the Labor Department before his certificate is issued." 111 Cong.Rec. 24227.

The plaintiff's definition of "place" would require the Department of Labor to compile statistics of employment availability for millions of employers. Such a requirement would indeed be a burden on the Department of Labor and would be "disruptive to the normal flow of immigration." On the other hand, plaintiff's argument in one respect is plausible. As has been stated, one of the purposes of the Act is to prevent aliens from taking jobs away from workers in the United States. The plaintiff was denied certification because there were sufficient workers available in the metropolitan New York area. If none of the available workers in the pertinent geographic region are willing to work at a specific place of employment, the statutory purpose is not well implemented by denying Ozbirman's application. This issue need not be decided, however, for the records of the Department of Labor indicate that qualified workers were referred to the specific place of employment and were deemed unsatisfactory by the employer. The labor certification procedure was not designed to cater to the personal quirks of an employer, and the failure of the instant employer to fill his manpower needs through various facilities for obtaining available workers does not carry the day for Ozbirman.

Accordingly, Ozbirman's petition for review, styled in the form of a motion for summary judgment, must be denied and her case dismissed. Webson's labor certification application is remanded to the Secretary of Labor for reconsideration as heretofore indicated.

It is so ordered.