BEVERLY ENTERPRISES, INC., and Beverly Health and Rehabilitation Services, Inc., Plaintiffs,

v.

Alexis M. HERMAN, Secretary of the United States Department of Labor, and The United States Department of Labor, Defendants.

No. Civ.A. 97–2475–SSH.

United States District Court, District of Columbia.

Oct. 26, 2000.

Steven Nathan Berk, Jenner & Block, Washington, DC, for plaintiffs.

AUSA David Jackson Ball, Jr., U.S. Attorney's Office, Civil Division, Washington, DC, for defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

Before the Court are the parties' cross-motions for summary judgment and their respective oppositions and replies thereto. Upon consideration of the parties' pleadings and the entire record, the Court grants plaintiffs' motion and denies defendants' motion. Although findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56, *see* Fed.R.Civ.P. 52(a); *Summers v. Department of Justice,* 140 F.3d 1077, 1079–80 (D.C.Cir.1998), the Court sets forth its reasoning.

## BACKGROUND

Plaintiffs Beverly Enterprises, Inc., and Beverly Health and Rehabilitation Services, Inc., own and operate a number of health care facilities that provide long-term nursing care and rehabilitation services. Defendants are the Secretary of

Labor and the Department of Labor (individually, and with the Secretary, "the DoL"). In January 1998, plaintiffs filed an amended complaint in this action, challenging, *inter alia*, regulations promulgated by the DoL pursuant to the Immigration Nursing Relief Act of 1989 ("INRA"), 8 U.S.C. §§ 1101(a)(15)(H)(i)(a), 1182(m) (1994) (repealed). On March 26, 1999, the Court dismissed plaintiffs' challenge to two of three regulations contained in Count One, as well as the remaining four counts of plaintiffs' lawsuit. *See Beverly Enterprises, Inc. v. Herman*, 50 F.Supp.2d 7 (D.D.C.1999). Remaining is plaintiffs' challenge to the third regulation contained in Count One—20 C.F.R. §§ 655.310(e)(1) & (f).

Congress enacted the INRA to alleviate a national shortage of registered nurses. *See* H.R.Rep. No. 101–288, at 1 (1989), *reprinted in* 1989 U.S.C.C.A.N. 1894. To that end, it established a program (the "H–1A program") allowing qualified registered nurses from foreign countries to come to the United States to work as nonimmigrant aliens for a period of up to five years.[1] *See* 8 U.S.C. §§ 1101(a)(15)(H)(i)(a), 1182(m)(4) (1994) (repealed). Congress required facilities seeking to employ alien nurses under the H–1A program to attest to the following six conditions:

(i) There would be a substantial disruption through no fault of the facility in the delivery of health care services of the facility without the services of such an alien or aliens.

(ii) The employment of the alien will not adversely affect the wages and working conditions of registered nurses similarly employed.

(iii) The alien employed by the facility will be paid the wage rate for registered nurses similarly employed by the facility.

(iv) Either (I) the facility has taken and is taking timely and significant steps designed to recruit and retain sufficient registered nurses who are United States citizens or immigrants who are authorized to perform nursing services, in order to remove as quickly as reasonably possible the dependence of the facility on nonimmigrant registered nurses, or (II) the facility is subject to an approved State plan for the recruitment and retention of nurses (described in paragraph (3)).

(v) There is not a strike or lockout in the course of a labor dispute, and the employment of such an alien is not intended or designed to influence an election for a bargaining representative for registered nurses of the facility.

(vi) At the time of the filing of the petition for registered nurses under section 1101(a)(15)(H)(i)(a) of this title, notice of the filing has been provided by the facility to the bargaining representative of the registered nurses at the facility or, where there is no such bargaining representative, notice of the filing has been provided to registered nurses employed at the facility through posting in conspicuous locations....

*Id.* § 1182(m)(2)(A). Congress imposed these attestation requirements to ensure that facilities employing alien nurses under the H–1A program took steps to recruit and retain United States ("U.S.") nurses. *See* H.R.Rep. No. 101–288, at 5, 1989 U.S.C.C.A.N. at 1898.

The Court also notes that Congress formally repealed the H–1A statute in the Nursing Relief for Disadvantaged Areas Act of 1999, Pub.L. 106–95, §§ 2(b) & (c), 113 Stat. 1312, 1312–16 (1999), and replaced it with a substantially similar program for admitting alien nurses to the United States. *See* 8 U.S.C.A. §§ 1101(a)(15)(H)(i)(c), 1182(m) (West Supp. 2000).

---

1. The deadline for filing admission petitions under the INRA expired on September 1, 1995. *See* Pub.L. No. 101–238, § 3(d), 103 Stat.2099, 2103 (1989). Nevertheless, an attesting facility's obligations under the INRA and its implementing regulations remain in effect until the expiration of any H–1A visas issued pursuant to petitions filed before September 1, 1995. *See* 20 C.F.R. § 655.310(p).

Although Congress set forth the specific attestation elements in the text of the INRA, it directed the Secretary of Labor to "publish final regulations to carry out" 8 U.S.C. § 1182(m). Pub.L. 101–238, § 3(c)(1), 103 Stat. at 2103. In accordance with that directive, the DoL promulgated the following regulations purporting to implement the second and third attestation elements:

(e) The second attestation element: ... (1) Wages. To meet the requirement of no adverse effect on wages, the facility shall attest that it shall pay each nurse of the facility at least the prevailing wage for the occupation in the geographic area. The facility shall pay the higher of the wage required pursuant to this paragraph (e) or the wage required pursuant to paragraph (f) of this section (i.e., the third attestation element: facility wage). . . .

(f) The third attestation element: facility/employer wage. The facility employing or seeking to employ the alien shall attest that "the alien employed by the facility will be paid the wage rate for registered nurses similarly employed by the facility." ... The facility shall pay the higher of the wage required pursuant to this paragraph (f) or the wage required pursuant to paragraph (e) of this section (i.e., the second attestation element: no adverse effect).

20 C.F.R. §§ 655.310(e) & (f). The combined effect of these regulations is to require a facility employing H–1A nurses to pay all of its nurses—citizens and aliens alike—the greater of the existing wage rate paid to nurses (the "facility wage rate"), or the prevailing wage rate.[2] The prevailing wage rate is essentially the average wage rate paid to similarly employed registered nurses in the same geographic area. See 20 C.F.R. § 655.302 (defining "prevailing wage").

Plaintiffs' amended complaint challenges the DoL's regulations implementing the INRA's second and third attestation elements under the Administrative Procedure Act ("APA"), which authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Plaintiffs argue that the INRA requires facilities to pay H–1A nurses only the facility wage rate, and provides no basis for requiring a facility to pay all of its registered nurses the prevailing wage rate where that wage rate is higher than the facility wage rate.[3] The DoL contends that Congress vested it with substantial discretion to ensure that wages are not adversely affected by the H–1A program by delegating it authority to publish final rules under the INRA, and that §§ 655.310(e)(1) & (f) are "reasonable and consistent with the purpose and structure of INRA." Defs.' Mot. at 10–13.

## STANDARD OF REVIEW

Summary judgment may be granted only if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the foregoing Background demonstrates, plaintiffs' chal-

2. Although these regulations refer to "wages" as opposed to "wage rates," the terms appear to be used interchangeably. See Defs.' Mot. at 8 (citing 20 C.F.R. § 655.310(e)(1), and noting that "the DoL's regulations provided that both United States and nonimmigrant nurses were to be paid the higher of either the facility wage rate or the prevailing wage rate for nurses in the geographic area.").

3. As explained in the Court's earlier Opinion, the motivation for plaintiffs' lawsuit was the DoL's investigation into plaintiffs' compliance with the INRA. See Beverly Enterprises, Inc., 50 F.Supp.2d at 10. In March 1998, the DoL issued determination letters purporting to find violations of its H–1A regulations and assessing plaintiffs over $4 million in back pay and penalties. See Pls.' Mot. at 3; Defs.' Mot. at 2 n. 1. Those alleged violations are the subject of an on-going administrative proceeding. See Pls.' Mot. at 3 n. 1; Defs.' Mot. at 2 n. 1.

lenge to §§ 655.310(e)(1) & (f) turns on a question of statutory interpretation— whether the INRA authorizes the DoL to promulgate regulations requiring facilities to pay the greater of the facility or prevailing wage rate to all registered nurses as a condition of hiring an alien nurse under the H–1A program. Accordingly, it is appropriate for resolution on a motion for summary judgment.

The Court's inquiry into the proper interpretation of the INRA proceeds under the Supreme Court's well-known framework in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, the Court asks "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. This inquiry requires the Court to exhaust "traditional tools of statutory construction," which include examining the statute's text, legislative history, structure, and purpose. *Natural Resources Defense Council, Inc. v. Daley,* 209 F.3d 747, 752 (D.C.Cir.2000) (quoting *Bell Atlantic Tel. Cos. v. FCC,* 131 F.3d 1044, 1047 (D.C.Cir.1997)). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. If, however, the statute is "silent or ambiguous with respect to the specific issue," the Court proceeds to step two of the *Chevron* analysis and asks "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

## DISCUSSION

■ Plaintiffs argue that the DoL's regulations are invalid because the plain language of the INRA requires facilities to pay only the facility wage rate to alien nurses under the H–1A program.[4] The DoL counters that the INRA's language is not so clear, and that the DoL's regulations are entitled to deference under step two of *Chevron* because, although Congress enacted the specific attestation elements in the INRA, "it left to the DoL the tasks of defining key statutory terms" by providing it with "broad legislative rulemaking authority." Defs.' Mot. at 11–12. The DoL contends that 20 C.F.R. § 655.310(e)(1), which sets the floor for wage rates at the prevailing wage rate, is a permissible construction of the second attestation element because it "is a time tested method for preventing wage reductions as a result of an influx of foreign workers." Defs.' Mot. at 13–14. Further, 20 C.F.R. § 655.310(f), which requires payment of the facility wage rate where it is higher than the prevailing wage rate, is a permissible construction of the third attestation element because it provides separate and additional protection for domestic nurses, and protects alien nurses as well. *See* Defs.' Reply at 2. Upon consideration of the parties' arguments, the Court finds that the DoL exceeded its statutory authority by promulgating 20 C.F.R. §§ 655.310(e)(1) & (f) because the plain language of the INRA clearly expresses Congress' intent that facilities hiring H–1A nurses be required to pay only the facility wage rate. This interpretation finds support in the INRA's legislative history, and is consistent with its structure and purpose.

### A. *Statutory Language and Legislative History*

At the outset, the Court rejects the DoL's attempt to justify its prevailing wage rate regulation on the grounds that the plain language of the INRA does not preclude its construction of the second element, and that because the INRA does not define what constitutes an "adverse effect" on wages and working conditions, its regulation is entitled to deference under step

---

4. Plaintiffs also argue that the regulations are unreasonable under step two of *Chevron*. *See*

Pls.' Reply at 2 n. 1.

two of *Chevron. See* Defs.' Mot. at 10–13; Defs.' Opp'n at 4–6. Simply because the INRA's language does not expressly bar the DoL's construction does not entitle it to deference: "[t]o suggest ... that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (i.e when the statute is not written in 'thou shalt not' terms), is both flatly unfaithful to the principles of administrative law ... and refuted by precedent." *Railway Labor Executives' Ass'n v. National Mediation Bd.*, 29 F.3d 655, 671 (D.C.Cir.1994) (en banc). Rather, because an agency's choices are constrained by the statute pursuant to which it acts, a court must first consider whether Congress has directly addressed the precise question at issue under step one of *Chevron. See id.; National Mining Ass'n v. Department of Interior*, 105 F.3d 691, 694–95 (D.C.Cir.1997).

The plain language of the INRA persuades the Court that Congress directly addressed the wage rate that facilities are required to pay under the H–1A program. The INRA's third attestation element required a facility to attest that "[t]he alien employed by the facility will be paid the wage rate for registered nurses similarly employed by the facility." 8 U.S.C. § 1182(m)(2)(A)(iii) (1994) (repealed). This provision explicitly defines the wage rate that the facility must pay to H–1A nurses as the facility wage rate. Moreover, it deprives the DoL of any basis for requiring the facility to pay the prevailing wage rate to H–1A nurses, much less to all registered nurses; that Congress specifically required payment of the facility wage rate in the third attestation element, and otherwise excluded mention of any other wage rate in the statute, evidences its intent to require payment of only the facility wage rate.[5] Indeed, a similar statute enacted shortly after the INRA indicates that when Congress intends to establish a two-pronged wage scheme similar to that required under 20 C.F.R. §§ 655.310(e)(1) & (f), it will expressly define all of the applicable wage rates; the statute setting forth the so-called "H–1B program," which provides for non-immigrant admission of alien employees outside the field of nursing, requires that employers hiring such aliens offer to pay them the greater of the "actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question," or the "prevailing wage level."[6] 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1182(n)(1)(A)(i).

---

**5.** This logic applies the familiar maxim *expressio unius est exclusio alterius* —the "[m]ention of one thing implies exclusion of another." *Martini v. Federal Nat'l Mortgage Ass'n*, 178 F.3d 1336, 1342 (D.C.Cir.1999) (quoting Black's Law Dictionary 581 (6th ed.1990)) (brackets in original); *see also* 2A Sutherland, *Statutes and Statutory Construction* § 47.23 (Norman J. Singer ed., 6th ed. 2000) ("A statute which provides that a thing shall be done in a certain way carries with it an implied prohibition against doing that thing in any other way."). The Court is mindful of the admonition by the Court of Appeals for this Circuit that "[t]he maxim's force in particular situations depends entirely on context," and "will turn on whether, looking at the structure of the statute and perhaps its legislative history, one can be confident that a normal draftsman when he expressed 'the one thing' would have likely considered the alternatives that are arguably precluded." *Shook v. District of Columbia Fin. Responsibility and Management Assistance Auth.*, 132 F.3d 775, 782 (D.C.Cir.1998); *see also Independent Ins. Agents, Inc. v. Hawke*, 211 F.3d 638, 644 (D.C.Cir.2000) ("True we have rejected the [*expressio unius* ] canon in some administrative law cases, but only where the logic of the maxim ... simply did not hold up in the statutory context."). As discussed *infra*, upon consideration of the INRA's legislative history, structure, and purpose, the Court is confident that, by specifying the facility wage rate, Congress considered the alternatives and intended to require payment of only that wage rate.

**6.** The DoL explains the discrepancy in the specificity of the language employed by Congress in the H–1A and H–1B statutes on the grounds that the INRA was Congress' first attempt at using an attestation process and that, when it drafted the H–1B statute, it had the benefit of the DoL's proposed regulations under the H–1A programs and modeled the H–1B statute after those regulations. *See*

The DoL contends that interpreting the third attestation element as an expression of Congress' intent to require payment of only the facility wage rate under the H–1A program renders the second element's reference to "wages" superfluous insofar as the third element already guards against any adverse effect on wages. The DoL's argument, however, erroneously assumes that a "wage rate" is synonymous with "wages." That the INRA's second and third attestation elements distinguish between the terms suggests that Congress did not use them synonymously. Moreover, the plain meaning of the terms indicates that a "wage rate" often represents only a component of "wages"; the dictionary defines "wage rate" as "the amount of base wage paid to a worker per unit of time (as per hour or day) or per unit of output if on piecework," and defines "wage(s)" more broadly as "a pledge or payment of usu[ally] monetary remuneration by an employer esp[ecially] for labor or services usu[ally] according to contract and on an hourly, daily, or piecework basis and *often including bonuses, commissions, and amounts paid by the employer for insurance, pension, hospitalization, and other benefits . . . .* " *Webster's Third New Int'l Dictionary* 2568–69 (1981) (emphasis added).[7] Indeed, notwithstanding its argument about the superfluousness of the second element's reference to "wages" under the Court's interpretation, the DoL agrees with the "proposition that the term 'wages' is expansive and includes the employee's basic wage rate as well as the less obvious forms of compensation." *See* Defs.' Opp'n at 17.[8] Thus, because the INRA did not use the terms "wage rate" and "wages" synonymously, the Court's interpretation of the third attestation element does not render the second element's reference to "wages" superfluous. Rather, it gives effect to both provisions; the third element requires facilities to pay H–1A nurses the facility wage rate, while the second element prohibits the hiring of H–1A nurses from affecting the remaining variables that make up wages and working conditions. Congress certainly was entitled to specify a more particular method for protecting domestic wage rates in the third element, instead of relying on the second element's general prohibition to effectuate this goal.

The INRA's legislative history supports the Court's interpretation of the statute as requiring payment of only the facility wage rate. *See City of Cleveland v. Nuclear Regulatory Comm'n*, 68 F.3d 1361, 1366 n. 4 (D.C.Cir.1995) ("[W]e may consider a provision's legislative history in the first

Defs.' Opp'n at 11–14. As discussed *infra*, however, the argument that Congress somehow expressed approval of the DoL's H–1A regulations by enacting the H–1B statute lacks merit.

7. Another dictionary defines "wage" as "[p]ayment for services to a worker, esp[ecially] remuneration on an hourly, daily, or weekly basis or by the piece." *American Heritage Dictionary* 1359 (2d College Ed.1982); *see also Black's Law Dictionary* 1573 (7th ed.1999) (defining "wage" as "[p]ayment for labor or services, usu[ally] based on time worked or quantity produced."). Although this definition emphasizes the wage rate component, its reference to "payment for services" is broad enough to include benefits and bonuses paid to workers.

8. This broader understanding of "wages" comports with cases construing a provision of the predecessor to the permanent alien labor certification statute, 8 U.S.C. § 1182(a)(14) (1982) (now codified at 8 U.S.C. § 1182(a)(5)), which contains language identical to that in the INRA's second element. Those cases construe "not adversely affect the wages and working conditions" to encompass a range of variables affecting wages and working conditions. *See Ozbirman v. Regional Manpower Adm'r*, 335 F.Supp. 467, 472 (S.D.N.Y.1971) ("The term 'adverse effect' is necessarily a box of variables. Shorter hours, unique vacation periods or working conditions, proximity to home and family, and exceptional fringe benefits are all factors which influence the labor market and have an effect on wages in the country."); *see also Industrial Holographics, Inc. v. Donovan*, 722 F.2d 1362, 1368 (7th Cir.1983) ("We agree with the *Ozbirman* court that a truly thorough analysis of adverse effects involves factors other than wages.").

step of *Chevron* analysis to determine whether Congress' intent is clear from the plain language of a statute."). As drafted, the House version of the INRA would have required employers to attest, under the third element, that "[t]he alien will be paid at the prevailing wage rate for registered nurses similarly employed by the facility." H.R.3259, 101st Cong. § 3(b) (1989) (Pls.' Mot., Ex. B). The Senate, however, offered a substitute bill that deleted the term "prevailing" from this clause, *see* H.R.3259, 101st Cong. § 3(b) (1989) (as reported by Chairman of Sen. Judiciary Comm. with amendments) (Pls.' Mot., Ex. C), and this version ultimately was accepted by the House and enacted into law. By deleting any reference to a prevailing wage rate from the third element, Congress emphasized what is clear from the face of the statute—that employers were required to pay only the facility wage rate to H–1A nurses.

The DoL attempts to explain the Senate amendment to the House bill on the grounds that it would have been redundant for the third element to require a prevailing wage rate because the second element already provides for it, and that the Senate was merely clarifying an ambiguity in the House bill caused by the third element's confusing reference to both a prevailing wage rate and a facility wage rate. The INRA's legislative history, however, does not supply any evidence of Congress' alleged belief that the second attestation element already provides for payment of the prevailing wage rate, and, as discussed below, the language of the second element is simply not amenable to such a construction in the context of this statute.[9] While the Court agrees with the DoL that the

House version of the third element was ambiguous, the Court finds the clarification effected by the Senate amendment telling; faced with references to both a facility and a prevailing wage rate, Congress eliminated any reference to a prevailing wage rate.

Nevertheless, relying on two canons of statutory construction, the DoL contends that the INRA actually called for a construction requiring payment of at least the prevailing wage rate to all registered nurses.[10] First, the DoL argues that interpreting the language of the second attestation element to require a prevailing wage rate is consistent with the definition historically accorded to language in other alien labor statutes barring any adverse effect on wages and working conditions. For example, the permanent alien labor certification program permits employers to hire aliens to work at permanent jobs where the DoL has certified that, *inter alia*, "the employment of such alien[s] will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1182(a)(5)(A)(i)(II). The DoL notes that its regulations under this program have consistently required the employer to pay the alien at least the prevailing wage rate. *See* Defs.' Mot. at 18 (citing 20 C.F.R. § 656.20(c)(2)). The DoL also points to its regulations under the "H–2A program," which permits entry of foreign workers into the U.S. to perform agricultural labor upon the DoL's certification that, *inter alia*, "the employment of the alien[s] . . . will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a),

9.  The Court notes that the House interpreted the third attestation element in its draft to require payment of the prevailing wage rate. *See* H.R.Rep. No. 101–288, at 5, 1989 U.S.C.C.A.N. at 1898. If, as the DoL alleges, the INRA's second attestation element already requires payment of the prevailing wage rate, it is unclear why the House would have inserted a prevailing wage rate requirement in the third element of its initial draft.

10. For the most part, the DoL raises these arguments to show that its regulations are a permissible construction of the INRA under step two of *Chevron. See* Defs.' Mot. at 13–23. Finding Congress' intent to require payment of only the facility wage rate otherwise clear, the Court considers whether the DoL's arguments render this intent ambiguous under step one of *Chevron.*

1188(a)(1)(B). These regulations require employers to offer to pay alien and U.S. workers at least the prevailing wage. *See* Defs.' Mot. at 21 (citing 20 C.F.R. §§ 655.102(a), (b)(9)(i), 655.107). Invoking the canon of statutory construction that statutes *in pari materia*,—i.e., statutes relating to the same subject or object— should be construed together, the DoL argues that the second attestation element under the INRA must be construed to authorize the DoL to promulgate regulations requiring payment of the prevailing wage rate. *See* Defs.' Opp'n at 7–8.

The Court disagrees. The rule that statutes *in pari materia* should be construed together "is but a logical extension of the principle that individual sections of a single statute should be construed together, for it necessarily assumes that whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject." *FAIC Securities, Inc. v. United States,* 768 F.2d 352, 363 (D.C.Cir.1985) (quoting *Erlenbaugh v. United States,* 409 U.S. 239, 244, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972)). Nevertheless, the rule applies only when the statute to be construed is ambiguous. *See District of Columbia v. Gladding,* 263 F. 628, 629 (D.C.Cir.1920); *Northern Pac. Ry. Co. v. United States,* 156 F.2d 346, 350 (7th Cir. 1946); 2B Sutherland, *Statutes and Statu-*

*tory Construction* § 51.01 (Norman J. Singer ed., 5th ed.1992). As discussed, the Court does not find any ambiguity in the INRA's second and third attestation elements. In any event, the alien labor statutes cited by the DoL are not suitable for comparison because, unlike the INRA, neither of those statutes attempts to define a wage rate; that the adverse effect language in those statutes is deemed to authorize the DoL to require payment of a prevailing wage rate provides scant guidance in construing a statute containing a specific directive that facilities shall pay aliens the same wage rate paid to similarly employed nurses. Finally, as plaintiffs correctly note, the DoL's *in pari materia* argument conflates the DoL's interpretation of the two statutes with Congress' interpretation. Congress has never defined or interpreted the adverse effect language in the two statutes to require payment of the prevailing wage rate; rather, the DoL advanced this interpretation in its regulations. The absence of any such congressional understanding belies the assumption underlying the *in pari materia* rule that, whenever Congress passes a new statute, it acts aware of all previous statutes—as opposed to regulations thereunder—on the same subject.[11] In sum, the DoL's reliance on this doctrine unavailing.

11. To be sure, the DoL notes that the Seventh Circuit upheld its authority to issue a prevailing wage regulation under the permanent alien labor certification statute in *Industrial Holographics, Inc.,* 722 F.2d at 1366–68. *See* Defs.' Mot. at 18–19. Nevertheless, in order to ascribe the Seventh Circuit's interpretation of the DoL's statutory authority to Congress for purposes of applying the *in pari materia* rule, the DoL must rely on the doctrine of legislative acquiescence, which posits that "Congress' failure to disturb a consistent judicial interpretation of a statute may provide some indication that Congress at least acquiesces in, and apparently affirms, that [interpretation]." *Monessen Southwestern Ry. Co. v. Morgan,* 486 U.S. 330, 338, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988) (quoting *Cannon v. University of Chicago,* 441 U.S. 677, 703, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)) (brackets in original). *But see Central Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S.

164, 186, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (questioning efficacy of acquiescence doctrine as a measure of congressional intent). One federal appeals court case interpreting the adverse effect language in the permanent alien labor certification statute, however, hardly amounts to the "consistent judicial interpretation" necessary to support application of the legislative acquiescence doctrine.

With respect to the H-2A statute, the DoL notes that, under the predecessor statute, 8 U.S.C. §§ 1101(a)(15)(H)(ii), 1184 (1982), the Attorney General delegated the DoL the responsibility of certifying "that the employment of the [foreign worker] will not adversely affect wages and working conditions of workers in the United States similarly employed." Defs.' Mot. at 19–20 (quoting 8 C.F.R. § 214.2(h)(3)(i)(A) (1985)). Pursuant to that delegation, the DoL promulgated regu-

The DoL also invokes the doctrine of legislative reenactment to support its regulations requiring employers to pay the greater of the facility or prevailing wage rate under the H–1A program. As discussed *supra* in note 11, in order to construe congressional reenactment of a statute as an adoption of an agency interpretation thereunder, there must be a showing that Congress was aware of, and expressly approved of, the prior agency position. *See General Am. Transp. Corp. v. I.C.C.,* 872 F.2d 1048, 1053 (D.C.Cir. 1989); *AFL—CIO v. Brock,* 835 F.2d 912, 915–16 (D.C.Cir.1987). The DoL first argues that Congress approved of the DoL's construction of the INRA when it enacted the H–1B program under the Immigration Act of 1990 ("IMMACT"), Pub.L. No. 101–649, 104 Stat. 4978 (Nov. 29, 1990), because the H–1B statute tracks the language of the DoL's proposed regulations under the H–1A statute. *See* Defs.' Opp'n at 13–14. Nevertheless, the legislative reenactment doctrine applies (quite literally) to reenactment of the same statute; the Court is aware of no cases applying the doctrine to the scenario posited by the ·DoL, in which Congress enacts a new statute and thereby ratifies an agency interpretation under a separate statute. In any event, assuming application of the doctrine were proper in such a situation, its preconditions have not been met. In support of its argument, the DoL notes only that it received comments to its proposed H–1A regulations from four members of Congress. *See* Defs.' Opp'n at 14 n. 7. Regardless of whether those comments sufficiently evidence "congressional awareness," the DoL has made no showing that Congress expressly approved the H–1A regulations in enacting the H–1B statute. For the same reason, the DoL's second legislative reenactment argument must fail. The DoL attributes significance to the fact that Congress did not overturn the DoL's construction of the second and third attestation elements when it. enacted technical amendments to the INRA under the IMMACT and the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub.L. No. 102–232, 105 Stat. 1733 (Dec. 12, 1991). Again, however, assuming Congress was even aware of the DoL's construction, there is simply no evidence of express approval. Because "[i]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law," *AFL—CIO,* 835 F.2d at 915 (quoting *Girouard v. United States,* 328 U.S. 61, 69, 66 S.Ct. 826, 90 L.Ed. 1084 (1946)), the DoL's legislative reenactment arguments lack merit.

In sum, the DoL's arguments in support of its construction requiring payment of at least the prevailing wage rate are unpersuasive and, under step one of *Chevron,* do not render ambiguous Congress' clear intent, as expressed in the INRA's statutory language and legislative history, to require payment of only the facility wage rate. The Court briefly addresses the DoL's arguments that this understanding of con-

---

lations requiring employers to pay U.S. and alien workers at least the prevailing wage rate. 20 C.F.R. §§ 655.200(b), 655.207(a) (1984); *see also Shoreham Cooperative Apple Producers Ass'n v. Donovan,* 764 F.2d 135, 137 (2d Cir.1985). Because the new H–2A statute, enacted in 1986, tracked the language delegating certification responsibility to the DoL under the predecessor statute, the DoL argues that Congress approved its regulation requiring payment of the prevailing wage. *See* Defs.' Mot. at 19–21. The Court disagrees. The DoL's argument appears to rely on the doctrine of legislative reenactment, under which Congress ratifies an administra-

tive interpretation of a statute through reenactment. That doctrine, however, "requires a showing of both congressional awareness and express congressional approval of an administrative interpretation if it is to be viewed as statutorily mandated." *General Am. Transp. Corp. v. I.C.C.,* 872 F.2d 1048, 1053 (D.C.Cir. 1989) (internal quotation marks and citation omitted). That Congress used language almost identical to that in the delegation to the DoL when it enacted the new H–2A statute raises only an inference of awareness, and does not evidence express approval of the DoL regulation requiring payment of the prevailing wage rate.

gressional intent conflicts with the INRA's structure and purpose.

## B. *Statutory Structure and Purpose*

The DoL contends that requiring payment of only the facility wage rate defeats the purpose of the first and fourth attestation elements. The first element required a facility to attest that it faced "a substantial disruption through no fault of the facility in the delivery of health care services without the services of" an alien nurse. *See* 8 U.S.C. § 1182(m)(2)(A)(i) (1994) (repealed). The DoL argues that the Court's interpretation defeats the purpose of this element by allowing a facility to pay less than the prevailing wage rate; such a facility "would not qualify for H–1A nurses because its inability to obtain domestic nurses is based upon its unwillingness to pay at least the prevailing wage, and its nursing shortage would be of its own making." Defs.' Opp'n at 18. As plaintiffs correctly note, however, the DoL's argument assumes what it is trying to prove—that the prevailing wage rate is somehow required. Although the DoL claims that the prevailing wage rate is a "reasonable benchmark" for measuring fault, Defs.' Reply at 8, Congress might have logically assumed that an employer would not incur fault simply by paying below the prevailing wage rate because the employer could compensate for the below-average wage rate by providing nurses with other perks, such as bonuses, vacation days, sick days, or shift preferences. *See* Pls.' Reply at 16–17. Furthermore, the prevailing wage rate is equal to the average wage rate in the region; that a number of employers, under this definition, necessarily will pay nurses below the prevailing wage rate persuades the Court that payment of this wage rate is not an appropriate measure of fault under the first element.[12] According-

ly, the alleged inconsistency between the first element and the requirement that employers pay only the facility wage rate is unfounded.

Nor does the facility wage rate requirement defeat the purpose of the fourth attestation element, which required a facility to attest that it was "taking timely and significant steps designed to recruit and retain sufficient registered nurses who are United States citizens or immigrants . . ., in order to remove as quickly as reasonably possible the dependence of the facility on nonimmigrant registered nurses." 8 U.S.C. § 1182(m)(2)(A)(iv) (1994) (repeated). The DoL argues that "[a] facility that does not need to attract domestic nurses with higher wages, because it can hire alien nurses at wages that are lower than those prevailing in the area, is not taking steps to recruit and retain domestic workers." Defs.' Opp'n at 19. Nevertheless, the INRA provides that raising salaries is not the exclusive means by which a facility may take steps to recruit and retain domestic nurses; the statute sets forth a non-exhaustive list of optional steps satisfying the fourth element, and provides that paying registered nurses above the prevailing wage rate is only one such step. *See* 8 U.S.C. § 1182(m)(2)(B) (1994) (repealed). Because the fourth element does not require a facility employing H–1A nurses to raise its salaries, the DoL's argument lacks merit.

Finally, the Court's interpretation of the INRA is consonant with the overriding purpose of the statute—to alleviate a national shortage of qualified nurses which "forced some hospitals, both urban and rural, to close beds and occasionally entire wings." H.R.Rep. No. 101–288, at 1–2, 1989 U.S.C.C.A.N. at 1894–95. That purpose is ill-served under the DoL's regula-

---

12. The Court also notes that the DoL's argument appears to undermine the need for 20 C.F.R § 655.310(e)(1) in the first place; if payment of the prevailing wage rate was a precondition of hiring H–1A nurses by virtue of being a measure of fault under the first element, there would be little need to require payment of the prevailing wage rate under the second element to ensure that employment of such nurses did not adversely affect domestic wages and working conditions.

tions when a facility pays its nurses below the prevailing wage rate because the facility is required to raise the wages of its entire nursing staff in order to avail itself of the relief offered by the H–1A program.[13] By contrast, a requirement that employers pay alien nurses at the facility wage rate removes any disincentive for hiring H–1A nurses created by the prospect of higher costs because it does not require the facility to adjust the wage levels of its existing nursing staff. Moreover, consistent with Congress' concern that the H–1A program not adversely affect domestic wage levels, *see* 8 U.S.C. § 1182(m)(2)(A)(ii) (1994) (repealed); H.R.Rep. No. 101–288, at 5, 1989 U.S.C.C.A.N. at 1898, this requirement adequately protects the existing wage levels of domestic nurses by preventing facilities from hiring alien nurses at lower wage rates.

Nevertheless, the DoL argues that requiring employers to pay a facility wage rate without also setting the prevailing wage rate as a floor will actually depress local wages by allowing facilities that employ U.S. workers at less than the prevailing wage rate "to supplement their ranks with a steady supply of foreign workers who would accept low wages, creating a lower wage scale for as long as the alien workers remain in the country." Defs.' Mot. at 15. The DoL's argument is misplaced. First, if a facility was originally paying its nurses less than the prevailing wage rate, it was not the hiring of H–1A nurses that caused the lower wage level. Second, such a facility would not be able to keep the wage level depressed by hiring a steady stream of foreign nurses because the fourth attestation element requires facilities to take timely and significant steps to recruit and retain domestic nurses. Finally, even if supplementing the INRA's

facility wage rate requirement with a prevailing wage rate floor would better effectuate Congress' intent of alleviating the national shortage of registered nurses while simultaneously protecting wage levels, it is not the province of this Court to authorize substitution of a potentially more effective method where Congress has clearly provided for one in the statute. *See MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 231 n. 4, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (noting that the court and the agency "are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."); *National Coal Ass'n v. Chater*, 81 F.3d 1077, 1082 (11th Cir.1996) (noting that a "general appeal to statutory purpose" may not "overcome the specific language of the Act, because the text of a statute is the most persuasive evidence of Congress' intent."); *Orca Bay Seafoods v. Northwest Truck Sales, Inc.*, 32 F.3d 433, 436 (9th Cir.1994) ("It is one thing to construe the statutory language to see whether one construction makes more sense than the other as a means of attributing a rational purpose to Congress.... It is quite another to treat the purpose, and not the operative words of the statute, as the law.") (internal quotation marks and citation omitted); *see also Arent v. Shalala*, 70 F.3d 610, 620 (D.C.Cir.1995) (Wald, J., concurring) (noting that court may invalidate agency decision under *Chevron* as inconsistent with its statutory mandate, even though decision was not arbitrary, where it "believe[s] the agency's course of action to be the most appropriate and effective means of achieving a goal, but determine[s] that Congress has selected a different—albeit, in [the court's] eyes, less propitious—path.").[14]

13. While perhaps extreme, the following hypothetical scenario posited by plaintiffs illustrates the tension between the DoL's regulations and the INRA's overriding purpose: under 20 C.F.R. §§ 655.310(e)(1) & (f), a facility that employs 299 domestic nurses and

pays them less than the prevailing wage rate would have to raise the wage rates of all 299 domestic nurses before hiring one H–1A nurse. Pls.' Mot. at 22.

14. The DoL also argues that requiring payment of only the facility wage rate would give

**12**

## CONCLUSION

At bottom, this is a very simple case. Congress enacted the INRA to alleviate a national shortage of registered nurses by allowing health care facilities to hire alien nurses. To guard against any erosion in the wage rates of domestic nurses as a result of this program, Congress required each facility hiring alien nurses to pay the aliens the same wage rate paid to its similarly employed domestic nurses (*i.e.*, the facility wage rate). Nevertheless, drawing on the INRA's general prohibition that the hiring of alien nurses not adversely affect the wages and working conditions of domestic nurses, the DoL promulgated regulations requiring facilities availing themselves of the H–1A program to pay all nurses the greater of the facility or prevailing wage rate. Where the facility wage rate is less than the prevailing wage rate, these regulations effectively supplant the specific method chosen by Congress to protect domestic wage rates with the method preferred by the DoL. Because the plain language and legislative history of the INRA, as buttressed by its structure and purpose, will not sustain this form of regulatory bootstrapping, the Court concludes that 20 C.F.R. §§ 655.310(e)(1) & (f) exceed the DoL's statutory authority, and must be set aside. Accordingly, the Court grants plaintiffs' motion for summary judgment and denies defendants' motion for summary judgment. An appropriate Judgment accompanies this Opinion.

facilities employing only H–1A nurses a competitive advantage over facilities employing U.S. nurses because they will be able to pay a low wage rate, which in turn will prompt the facilities employing U.S. workers to lower their wage levels. The Court, however, finds the possibility that facilities are able to hire and retain only H–1A nurses exceedingly remote: the third attestation element presupposes that facilities seeking to hire H–1A nurses already are employing U.S. nurses, and the fourth attestation element requires facilities to take timely and significant steps to recruit and retain U.S. nurses.